David M. GESHWIND, Plaintiff,

v.

Edward GARRICK, Individually, Edward Garrick Productions, Inc., the Science Museum of Minnesota, and the Association for Computing Machinery, Defendants.

EDWARD GARRICK PRODUCTIONS, INC. and the Association for Computing Machinery, Third–Party Plaintiffs,

v.

Judson ROSEBUSH and Digital Effects, Inc., Third–Party Defendants.

No. 85 Civ. 2136 (RPP).

United States District Court, S.D. New York.

April 12, 1990.

As Amended April 16, 1990.

Anne C. Avellone, New York City (Anthony H. Handal, of counsel), for plaintiff.

Squadron, Ellenoff, Plesent & Lehrer, New York City (Slade Metcalf, Mark H. Jackson, of counsel), for defendants and third-party plaintiffs.

Peter A. Silverstein, New York City, for third-party defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiff David Geshwind instituted this action in 1985 against Edward Garrick individually, and Edward Garrick Productions, Inc. (Productions), the producer of a computer animation film entitled "The Magic Egg," and against The Science Museum of Minnesota (SMM) and The Association for Computing Machinery (ACM), organizations which have exhibited The Magic Egg.

Plaintiff's suit is brought under the Copyright Act 17 U.S.C. § 501 et seq., and the Lanham Trade–Mark Act, 15 U.S.C. § 1125(a).

Defendant Productions makes third-party claims over against third-party defendants Judson Rosebush and Digital Effects, Inc. (Digital) based on an indemnity agreement. Defendant ACM also claims over against third-party defendant Digital based on an indemnity agreement.

A two-week non-jury trial was held from February 23 to March 8, 1990. This opinion constitutes the findings of fact and conclusions of law of the Court.

## FINDINGS OF FACT

1. Plaintiff David Geshwind, at the times relevant to this litigation, was a producer of computer graphics animation and special effects. Geshwind from time to time used the trade name Digital Video Systems.

2. Defendant Garrick is the owner of a film production company and has been involved in the production, direction and creation of certain computer animated films.

3. Defendant and third-party plaintiff Productions is a film production company, whose president is Garrick.

4. Defendant SMM is an institution located in St. Paul, Minnesota which exhibits various works and owns and operates the William L. McKnight—3M Omnitheater which has a domed ceiling on which are exhibited certain films.

5. Defendant and third-party plaintiff ACM is an association of individuals and corporations involved in the computer industry.

6. SIGGRAPH is ACM's Special Interest Group on Computer Graphics. Its members include engineers, architects, artists, animators and filmmakers, software and hardware developers and manufacturers, scientists, mathematicians and other professionals in the fields of computer graphics theory, design and implementation.

7. Third-party defendant Digital was at all times relevant to the events herein a corporation with facilities and services for the development and production of computer graphics animation which hired its facilities and services to others. Digital is no longer in business.

8. Third-party defendant Rosebush was for some period of time an employee of Digital.

9. In January 1982, Geshwind entered into a written agreement (the Production Agreement) with one Robert Ruenitz of Ruenitz Associates, Inc. (Plaintiff's Exh. 13)

10. The Production Agreement provided that Geshwind would produce for Ruenitz and his client a 15–second piece of animation (the Piece).

11. It was anticipated that the Piece would be included in a commercial being produced by a Japanese advertising agency

called Meitsu for a Japanese client called the Tohoku Electric Power Company (Tohoku). Ruenitz's contact in Japan was Michiya Sumitani.

12. The Production Agreement stated, among other things, that:

a. Geshwind would "have the right to use images from the project for purposes of demonstration or publicity."

b. The "elements developed for the project would not be used in other commercial 'projects.'"

c. "Changes to this agreement, by either party, will be affected [sic] in writing and signature of both parties."

13. The Production Agreement provided that Geshwind would produce test elements at certain milestones and that Ruenitz would approve the elements at such milestones prior to further production.

14. The Production Agreement provided that Ruenitz would make payments to Geshwind for the production of the Piece at various milestones prior to further production.

15. Ruenitz provided Geshwind with a storyboard for the commercial and certain geographical information about Japan. (Defendants' Exh. D)

16. The storyboard for the Piece was developed and drawn by a Mr. Tomoe.

17. Geshwind hired Digital to provide certain facilities and perform certain services in connection with the production of the Piece.

18. Geshwind negotiated for the facilities and services of Digital through Rosebush.

19. Geshwind provided Digital with, among other things, the storyboard drawn by Tomoe and topographical maps of Japan.

20. The facilities and certain services of Digital were used in the production of the Piece.

21. At various times during the production of the Piece, Geshwind was in contact with Ruenitz.

22. At a certain production milestone provided in the Production Agreement, Geshwind sent test slides to Ruenitz.

23. At a certain production milestone provided in the Production Agreement, Geshwind showed a motion study to Tomoe.

24. In approximately March 1982, the final film negative of the Piece, eventually entitled "Japan Fly–By," was delivered to Ruenitz. It was anticipated that the Piece would be delivered to a Japanese advertising agency (Meitsu).

25. At some point in 1982, Digital included Japan Fly–By (under the name "Japan Power") in a demonstration or sampler reel entitled "Digital Effects Sample '82" (Digital's 1982 Sampler).

26. Digital's 1982 Sampler was shown at the Film and Video Show of the 1982 SIGGRAPH Conference.

27. Geshwind's demonstration or sampler reel, containing Japan Fly–By, was also shown at the 1982 SIGGRAPH Conference.

28. ACM/SIGGRAPH collects and compiles various computer graphic works and sells such compilations as issues of the SIGGRAPH Video Review.

29. Individuals and organizations submit computer graphic work to ACM/SIGGRAPH for inclusion in the SIGGRAPH Video Review without receiving payment from ACM/SIGGRAPH.

30. After the 1982 SIGGRAPH Conference, in or around August 1982, Digital submitted a Digital 1982 Sampler to the SIGGRAPH Video Review.

31. ACM/SIGGRAPH included a Digital 1982 Sampler in Volume 5 of the SIGGRAPH Video Review, which review was produced in 1982.

32. Volumes 5 and 6 of the SIGGRAPH Video Review, in the VHS and BETA format, are contained on one tape. Volumes 5 and 6 of the SIGGRAPH Video Review in the ¾" format are contained on separate tapes.

33. The copy of Digital's 1982 Sampler included in the SIGGRAPH Video Review

was followed by the closing credit "3. Japan Power, DVS." DVS refers to a corporation once solely owned and operated by Geshwind.

34. The Magic Egg is a compilation of computer animated film segments running approximately 15 minutes in length. The Magic Egg was produced in the Omnimax format and was intended for projection on a domed screen.

35. The concept for the Omnimax project was presented in the form of a letter to potential participants from Nelson Max dated December 7, 1982 (Plaintiff's Exh. 32) and subsequently in at least one meeting in Detroit at the same time as the 1983 annual SIGGRAPH conference in July by Max, Charles Henderson and Garrick.

36. The letter from Max solicited contributions for a "SIGGRAPH Show Reel" "illustrating the capabilities of computer graphics" and stated that "Presumably industrial sponsorship would generate and allow us to repay some of the costs from contributors. However, if this doesn't work out, I hope you are still willing to contribute to a SIGGRAPH show reel. If it is good enough, there is still a possibility of renting it to other Omnimax Theatres and generating income to pay back costs on some pro-rated basis."

37. On or about August 3, 1983 Garrick received a letter from Digital (Plaintiff's Exh. 18) which read: "Here are clips from the sequence Digital hopes to produce for the Imax film. They are the Times Square sequence and the Japanese Island. David Geshwind is functioning as producer."

38. On or about August 10, 1983 Garrick received a letter from Geshwind (Plaintiff's Exh. 17) concerning the possible inclusion of three pieces of computer graphics animation, including Japan Fly–By, in the Omnimax film, which Geshwind stated he had produced.

39. In the latter part of 1983, Garrick met with Rosebush at Digital and discussed potential ideas for film contributions to the Omnimax film from Digital.

40. Garrick and Digital ultimately agreed that Digital would submit to the Omnimax film product a segment of computer graphics animation.

41. Garrick provided a storyboard for a piece of computer graphics animation to Digital (Plaintiff's Exh. 16) containing the following description: "The gridwork of the city transforms into another gridwork—a topological map of a mountainous island. We have stopped our ascent and suddenly find ourselves poised on the Peak of a Cosmic Rollercoaster. On either side of us are Huge Light Pipes which resemble fiber optic coils. They stretch into the distance converging on the topographic landscape below. The Light Pipes pulsate with bursts of energy as we Rollercoaster Down, lurching ahead on a speedride. After several exciting turns and dips, the path straightens out to a high and distant horizon before us and a Planet comes into view as we fade from the rollercoaster."

42. After receiving this storyboard description, Digital submitted a piece of computer graphics animation to the Omnimax film which was eventually entitled "Rollercoaster."

43. The Magic Egg consisted of approximately 20 segments of computer graphics animation.

44. In 1983, Productions signed an agreement with ACM/SIGGRAPH (Defendants' Exh. G) whereby Productions loaned Garrick's services to SIGGRAPH to oversee the production and direction of a computer-animated Omnimax film and to assist SIGGRAPH in "securing corporate financing for the production of the project" (1983 Agreement).

45. The 1983 Agreement provided that Productions would, for the term of twenty years, have the exclusive right to distribute the Omnimax film "through the Imax/Omnimax medium and form" and the non-exclusive right to distribute the Omnimax film in and through other mediums.

46. The 1983 Agreement set forth a formula by which any revenues generated from Productions' distribution of the Omnimax film would be distributed to Productions, ACM/SIGGRAPH and contributors.

47. On or about July 16, 1984, Productions and ACM/SIGGRAPH each entered into a supplemental agreement with the Museum (1984 Agreements) whereby the Museum agreed to help finance the completion of the Project in return for certain distribution and exhibition rights (Defendants' Exhs. H and J).

48. The 1984 Agreements provided that the Museum would have the exclusive right to distribute the Omnimax film to science museums and related forums.

49. The 1984 Agreements provided that Productions would have the exclusive right to distribute the Omnimax film to entities other than science museums.

50. The 1984 Agreements set forth a formula by which any revenues generated from the licensing of the Omnimax film by the Museum to science museums would be distributed to the sponsors, Productions and contributors.

51. In or around August 1984, Productions entered into license agreements with contributors to The Magic Egg which set forth a formula by which revenues generated by the film would be distributed.

52. A work print of The Magic Egg, including Rollercoaster, was exhibited at the Museum at certain screenings to conference attendees in conjunction with the 1984 SIGGRAPH conference in late or early August 1984.

53. The work print did not include credits, but credits for the film were displayed by slide projectors on the dome, which credits credited Rollercoaster to Digital and did not credit Geshwind.

54. Printed material was distributed to those who attended the VIP screenings of the film in conjunction with the 1984 SIGGRAPH Conference, which material included credits to contributors and other participants in the film, crediting Rollercoaster to Digital and without crediting Geshwind.

55. Subsequent to the initial showings of The Magic Egg, some articles were published about The Magic Egg in certain publications.

56. By letter dated August 20, 1984, from plaintiff's attorney, Anne C. Avellone, to the attorney for defendants Garrick and Productions, Robert Ungar, Avellone stated that "Mr. Geshwind will not object if the workprint of the film continues to be shown in its initial run at the OMNIMAX theater in Minneapolis. However, any exhibition of the finished work, or additional exhibition of the workprint, is objected to until a satisfactory solution to this problem is arranged."

57. Thereafter, in August 1984, Ungar on behalf of Productions requested that Geshwind execute a license agreement (Defendants' Exh. Z) in connection with the use of Rollercoaster in The Magic Egg, in the exact same form which Productions requested each of the contributors to the film to execute.

58. In a letter to Ungar dated August 30, 1984, Avellone wrote that "Mr. Geshwind has gone out of town for several days and will attend to the licensing agreement as soon as he returns."

59. In a letter to Ungar dated September 4, 1984, Avellone wrote that "with regard to the terms of the agreement itself, Mr. Geshwind will accept either a written guarantee that the agreement is identical to those signed by all of the other signatories or that a provision be included which provides that any advantage or additional right granted to any other signatory also be provided to him."

60. In a letter to Avellone dated September 7, 1984, Ungar stated: "Excepting the New York Institute of Technology, who has requested non-substantive changes in the license agreement, all licenses sent to contributors are the same. No other contributor has asked for a guaranty."

61. Geshwind never signed a license agreement in connection with the Omnimax film.

62. In or around December 1984, Productions sued Geshwind in California for specific performance, declaratory relief and money damages in excess of $515,000 in connection with the proposed license agreement.

63. The Court in California did not find a basis on which to assert personal jurisdiction over Geshwind.

64. On or about September 12, 1984, Geshwind filed a registration application for visual work, described as "a vector computer graphic computer simulation of flight over Japanese terrain following proposed power lines" entitled "Japan Fly–By" with the U.S. Copyright Office, which registration stated that he had produced, directed and designed computer animation and was the owner of the piece.

65. On or about September 12, 1984, the U.S. Copyright Office issued a Certificate of Copyright Registration (PA 228–127) for the work entitled Japan Fly–By to Geshwind.

The foregoing findings are almost identical to the parties' stipulated findings of fact. The Court makes the following additional findings of fact.

66. The storyboard for Japan Fly–By (Exh. D) comprised of a series of rough sketches showing scenes and describing the camera movement through those scenes to generate the overall effect was distributed by Ruenitz to three persons for bids on the proposed project.

67. Geshwind delivered the storyboard to Digital before submitting his bid to Ruenitz and discussed various ways of producing the proposed animation with Digital's chief animator, Don Leich, as well as other Digital executives knowledgeable in computer animation.

68. Three different techniques which might be utilized in the proposed film were discussed and cost estimates were provided by Digital to Geshwind, which he in turn utilized in making a tri-alternate proposal to Ruenitz. Ruenitz's client chose the least expensive alternative, a "wire-frame" method which had been recommended to Geshwind by Digital.

69. Geshwind then contracted with Digital to produce the computer film for him, which Digital agreed to do at a fixed price. (Exhibit UUU).

70. Geshwind delivered to Leich a topographical map of Japan received from Ruenitz and a contour tracing of a smaller portion of the map.

71. Leich then, acting entirely without Geshwind, engaged in an extremely complex task of building preparatory data from the contour map of the northern half of Japan, coloring in elevations on the map, and then prepared a digitized tablet on which the elevations appeared raised. In this way, the simulated terrains of a distant and close-up area of Japanese topography were prepared.

72. Digital had created terrain in this manner before for another client.

73. Geshwind, who was not familiar with the software system used by Digital, had asked to view the terrains when created and had asked for an adjustment mechanism whereby elevations could be changed.

74. Leich then prepared 5 or 6 sample frames of the terrain, utilizing advice of other Digital executives. Sample frames required the development of a data base of elevations, after an adapting of an elevation value system and rendering these results using the wire frame method and applying a light application to the wire mesh.

75. These sample frames were provided to Geshwind who in turn had them approved by Ruenitz's Japanese client.

76. Leich then worked on the flight path of the proposed Japan Fly–By, digitizing the anticipated path over the detailed terrain maps by developing a series of T-frame (time frame) positions over the terrain.

77. Once the proposed T-frame positions were developed, Leich called Geshwind for meetings to review the progress he was making. At these meetings, Geshwind would agree with the path contemplated by the storyboard or disagree and suggest changes.

78. After development of the proposed flight path was pretty much complete, Leich developed the motions of the film, generally by mathematical formulas which moved the camera focus up or down. However, a problem developed because the

flight path was curved and this meant the effect of banking, similar to that of an airplane in flight, had to be simulated.

79. Geshwind was unhappy with the early motion simulation as developed by Leich and employed a Mr. Alexander to provide a mathematical formula to be utilized by the computer to improve the simulated banking. Alexander had previously provided this mathematical formula for banking simulation when Geshwind had worked at the New York Institute of Technology in computer animation.

80. Geshwind only provided Alexander's formula to Leich verbally. Leich did not use the formula, but instead consulted another technician at Digital and used that technician's spline method, called CURVATURE, with an application called TILT, which had been previously used at Digital.

81. Geshwind viewed the result of Leich's application of the spline method and approved of the result, but was not made aware the Alexander formula had not been used.

82. Leich also developed the simulated power cable lines, which are somewhat transparent and flash light. Leich, a very credible, disinterested witness, testified that when Geshwind did review Leich's ongoing work product, which he did more often than those clients less knowledgeable in computer graphics, he suggested general changes which Leich would make note of and then, after Geshwind had left, would take into consideration in his complex task of building the data base towards to the completion of the work. Geshwind, who was not knowledgeable in Digital's software system, was unable to draft specific computer instructions on that system.

83. Leich did not always follow Geshwind's suggestions. In addition to requesting the Alexander formula, which Leich did not adopt, Geshwind suggested continual changing of the lines to achieve a feeling of rapid approach. Leich, however, used a change of resolutions method of quartering the white lines to achieve a seamless transition.

84. Geshwind disputes Leich's testimony, contending in effect that he gave Leich minute instructions in every aspect of Japan Fly–By, to such an extent that it was his sole creation. Geshwind is a self-interested witness. The Court accepts Leich's testimony as true and rejects that of Geshwind where it differs.

85. Leich was also responsible for the creation of the segment entitled "Rollercoaster," for which he admits Digital used the data base from Japan Fly–By as a starting point to work on a somewhat similar storyboard supplied by Garrick.

86. Leich made numerous changes in the Japan Fly–By data base to make Rollercoaster, which also uses the "fly-by" effect. He omitted the first contoured terrain entirely and changed the second terrain by scaling down the elevations; he adjusted the flight path to make the transition over the hills differently; he changed the horizon line and made the framing of the scenes lower; he changed the lighted tubes to make them more translucent; the motion of the camera is different, as is the rotation of the camera.

87. The Court has viewed both films on video and has viewed Rollercoaster in an IMAX theater and agrees with Leich that, although there is similarity in conception, there are significant differences in the two films.

CONCLUSIONS OF LAW

Section 201(a) of the Copyright Act provides, in pertinent part, that "[c]opyright in a work protected under this title vests initially in the author or authors of the work." 17 U.S.C. § 201(a) (1989). The Court concludes that Digital, through its employee Leich, was the creator of Japan Fly–By, both as a computer software data base and as a computer animated film.

The Court likens Mr. Leich to a painter who learned his techniques from other artists and teachers, and likens Mr. Geshwind to the agent for the person whose portrait was being painted. The fact that the agent, Geshwind, wanted changes in details and aspects of the portrait and even made suggestions, the compliance with which may or may not have improved the effect, does not make him the

creator. The artist, Leich, is the creator. *See Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 609 F.Supp. 1307 (E.D.Pa.1985), *aff'd*, 797 F.2d 1222 (3d Cir. 1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987) (under similar facts, court analogized to an owner explaining functions of a building to an architect, and concluded "[t]he architectural drawings are not co-authored by the owner, no matter how detailed the ideas and limitations expressed by the owner.") Here, Mr. Leich worked for Digital as an employee. Accordingly, Digital is an owner of Japan Fly–By and Rollercoaster. Therefore, under § 106 of the Copyright Act, Digital possessed the right to, *inter alia*, reproduce, distribute and display Japan Fly–By and plaintiff's claims under the Copyright and Lanham Acts are unfounded.

■ Alternatively, even if Digital is not the sole creator of Japan Fly–By, the work is a joint work of Digital and plaintiff under § 101 of the Copyright Act.[1] *See Community for Creative Non–Violence v. Reid*, 846 F.2d 1485 (D.C.Cir.1988), *aff'd*, — U.S. —, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *Strauss v. The Hearst Corp.*, No. 85 Civ. 10017, slip op., 1988 WL 18932 (S.D.N.Y.1988). A joint owner of a work does not need the permission of his joint owner to use or license the work, and neither he nor a party to whom he gives permission to use the work can be held liable to the other owner for infringement. *Strauss, supra.*[2] Accordingly, since defendants acted with Digital's permission in including Japan Power in the SIGGRAPH Video Review and Rollercoaster in The Magic Egg, they are not liable to plaintiff.

■ During trial, plaintiff for the first time articulated a claim of "malicious prosecution" and abuse of process against Productions arising out of a suit Productions brought against plaintiff in California for breach of contract and breach of covenant of good faith and fair dealing.[3] This claim of malicious prosecution and abuse of process was expanded upon on page 49 of plaintiff's Post Trial Memorandum of Law and Facts which was filed five days after the Court-ordered submission date of March 16, 1990. The claim is rejected as not raised in a timely manner. Nevertheless, the Court will also address the merits of the claim.

Productions' suit in California against plaintiff was based on plaintiff's failure to abide by, and misleading behavior in connection with, an alleged agreement in which Geshwind consented to the inclusion of the "Rollercoaster" segment in "The Magic Egg," and agreed upon the wording of the film credit for the segment. The alleged agreement had been negotiated between Productions' California attorney and Ms. Avellone, as plaintiff's attorney.

Plaintiff had attended the SIGGRAPH conference in July 1984 and protested to Mr. Garrick the inclusion of the "Rollercoaster" segment in the work print of "The Magic Egg," which was exhibited at the conference without any credit to him. In that conversation, plaintiff agreed to have his attorney try to resolve the matter with Productions' attorney. Plaintiff understood that production of the final version of "The Magic Egg" had to be completed in a couple of weeks. Nevertheless, plaintiff or Ms. Avellone waited approximately three weeks to first contact Productions' attorney, which was done by letter. Thereafter, Ms. Avellone wrote a letter indicating agreement with the wording of the credit which had been worked out between plaintiff and Digital. Productions' attorney and Productions relied on Ms. Avellone's letter and her position as plaintiff's authorized representative, and left the "Rollercoaster"

---

**1.** Section 101 defines joint work as follows:
A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.
17 U.S.C. § 101 (1989).

**2.** While the joint owner who uses the work must account to the other owner for any profits which are received from its use, *Reid*, 846 F.2d at 1498, plaintiff has not made any claim against Digital.

**3.** Such an action was brought in the State of California and dismissed for failure to effect service on Geshwind.

segment in the film. Work on the final editing of "The Magic Egg" proceeded on that basis. It is also unrebutted that thereafter plaintiff's counsel had a conversation with Productions' counsel in which she confirmed that the agreed upon wording of the credit language would be in the film, but in which she raised the question of reimbursement by Productions of her fees as counsel for plaintiff. Productions' California counsel responded with an inappropriate remark, which effectively ended further negotiation and caused plaintiff to disavow the agreement.

As a result of proceeding in reliance on Ms. Avellone's statements and conduct, Productions was now in a position where it had to remove the "Rollercoaster" segment from "The Magic Egg." Productions thereby incurred additional and unnecessary expense in re-editing the film, additional production costs, and time delays. Under these circumstances, the filing of the California lawsuit cannot be deemed malicious prosecution or abuse of process. Indeed, there was substantial reason to believe that plaintiff and his counsel sought to extract unwarranted consideration by withholding their written approval after Productions had relied on their statements and conduct. The Court concludes the California lawsuit had sufficient merit to be filed and cannot be deemed malicious prosecution or abuse of process, let alone unfair competition.

Judgment shall be entered for the defendants, with costs and attorneys' fees of the defendants and third-party defendants to be paid by plaintiff.

SO ORDERED.