BRIDGEPORT MUSIC, INC., et al.

v.

DIMENSION FILMS LLC, et al.[1]

No. 301–0412.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 11, 2002.

---

1. This action was originally captioned "Bridgeport Music, Inc. et al. v. 11C Music, et al." based on the original complaint (filed May 4, 2001; Docket Entry No. 1), which was almost one thousand pages in length and alleged close to five hundred causes of action against approximately eight hundred defendants. The Court severed the case by count into 476 surviving cases by Order dated July 25, 2001 (Docket Entry No. 349). The First Amended Complaint (filed Sept. 28, 2001; Docket No. 436) was filed against the remaining defendants, Dimension Films, No Limit Films and Miramax Film Corp., and the caption changed accordingly.

D'Lesli M. Davis, Richard M. DAvis, Richard S. Busch, Ralph E. Carter, Jr., King & Ballow, Nashville, TN, for Plaintiffs.

Robert L. Sullivan, John Claude Beiter, Loeb & Loeb, LLP, Nashville, TN, for Defendant.

## MEMORANDUM

HIGGINS, District Judge.

Pending before the Court is defendant No Limit Films's motion for summary judgment (filed June 21, 2002; Docket Entry No. 525). The defendant has filed the following in support of its motion: a memorandum (filed June 21, 2002; Docket Entry No. 526); a statement of undisputed facts (filed June 21, 2002; Docket Entry No. 527); and the declarations of Earl V. Spielman (filed June 21, 2002; Docket Entry No. 528), Madeleine Smith (filed June 21, 2002; Docket Entry No. 529), and Susan Bell (filed June 21, 2002; Docket Entry No. 530). The plaintiffs have filed the

following in opposition to the motion: a response memorandum (filed Aug. 20, 2002; Docket Entry No. 570); responses to the defendant's statement of undisputed facts (filed Aug. 20, 2002; Docket Entry No. 571); the declarations of Armen Boladian (filed Aug. 20, 2002; Docket Entry No. 572), Jane Peterer (filed Aug. 20, 2002; Docket Entry No. 573), Randy Kling (filed Aug. 20, 2002; Docket Entry No. 574), Alexander Stewart (filed Aug. 20, 2002; Docket Entry No. 575), and Vivian Junkins (filed Aug. 20, 2002; Docket Entry No. 576); deposition transcript excerpts (filed Aug. 20, 2002; Docket Entry No. 577); and a statement of additional material facts as to which the plaintiffs claim exist genuine issues to be tried (filed Aug. 20, 2002; Docket Entry No. 578). The defendant has filed a response to the plaintiffs' additional material facts (filed Sept. 3, 2002; Docket Entry No. 581), and, at the request of the Magistrate Judge[2], a supplemental memorandum in support of its motion (Sept. 6, 2002; Docket Entry No. 586). The plaintiffs have also filed at the Magistrate Judge's request a supplementary brief in opposition (filed Sept. 6, 2002; Docket Entry No. 587). Also before the Court is the supplement to the record filed by the plaintiffs pursuant to an order of the Court (entered Oct. 8, 2002; Docket Entry No. 599).

After careful consideration of the record, the motion is granted.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant asserts that it cannot be found liable for copyright infringement for the following reasons: (1) it possessed a valid license from at least one of Bridgeport's co-owners of the allegedly infringed work "100 Miles and Runnin" ' (hereinafter "100 Miles"); (2) Bridgeport executed a release related to "100 Miles"; (3) the portion of Bridgeport's composition "Get Off Your Ass and Jam" (hereinafter "Get Off") that was sampled by "100 Miles" is *de minimis* and therefore not subject to the protection of the copyright laws; and (4) the portion of Westbound's sound recording of "Get Off Your Ass and Jam" that was sampled by "100 Miles" is *de minimis* and therefore not subject to the protection of the copyright laws.

Defendant also asserts that any claims by plaintiffs Southfield Music, Inc. and Nine Records, Inc. should be dismissed because they do not own any interest in the songs at issue here. Southfield was previously dismissed by order of the Court (entered Aug. 14, 2002; Docket Entry No. 564). The plaintiffs in their response having voluntarily agreed to dismiss any claims by Nine, this plaintiff also will be dismissed.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law."

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The substantive law governing the claims

---

**2.** This motion was originally referred to the Magistrate Judge for a report and recommendation as to disposition (entered Feb. 22, 2002; Docket Entry No. 573). The reference has been withdrawn in order to expedite a decision of this motion before the commencement of trial on Nov. 12, 2002 (entered Sept. 27, 2002; Docket Entry No. 592).

will identify which facts are material. In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the non-moving party. *Matsushita Electric Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In order to defeat the motion, the non-moving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which it will bear the burden of proof at trial. *Celotex Corp.*, 106 S.Ct. at 2553. In making this showing, the non-moving party may not merely rest on conclusory allegations contained in the complaint, but must produce affirmative evidence supporting its claims. *Id.* In order to create a genuine factual issue, the non-moving party must show "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

As an initial matter, the Court must sort out the claims asserted by each plaintiff and their relation to the allegedly infringing activity of the defendant. Plaintiff Bridgeport appears to assert that the defendant has infringed both its rights in the musical composition "Get Off" and its rights in the musical composition "100 Miles." Plaintiff Westbound asserts that the defendant has infringed its rights in the sound recording of "Get Off" because a sample of the sound recording of "Get Off" is used in "100 Miles," which appears in defendant's film.[3]

## I.

### *LICENSE DEFENSE*

The following facts are undisputed. In May 1998, defendant released a film entitled *I Got the Hook Up*, which included on its soundtrack a recording of the song "100 Miles." The musical composition "100 Miles" was originally co-owned by Dollarz N Sense Music ("DNSM"), Ruthless Attack Muzick ("RAM"), Stone Agate Music and Hancock Music. In December 1998, Bridgeport acquired a twenty-five percent interest in the musical composition "100 Miles" as compensation for the use in "100 Miles" of a sample of the Bridgeport composition "Get Off."

Defendant claims that the original co-owners of "100 Miles" granted it an oral license to use the composition in its film during the summer of 1998. In June 2002, the original owners executed synchronization licenses to defendant that purport to be retroactive to the release date of the film. Defendant claims that by virtue of both the oral license granted in the summer of 1998 and the written licenses executed in June 2002, it has a valid license to utilize "100 Miles" in its film that defeats any claim of infringement by Bridgeport.[4]

Bridgeport claims that any license granted to defendant by the original owners does not grant a license for use of Bridgeport's twenty-five percent interest in "100 Miles" or for the use of the "Get Off" sample. Bridgeport relies upon the terms of the 2002 licenses, which state the percentage interest being granted by each of the original owners, to argue that the licenses only authorize the use of each of the original owner's interest, not the work in its entirety.

---

**3.** Westbound has offered no proof of any ownership interest in the sound recording of "100 Miles."

**4.** The defense of license applies only to Bridgeport's claims since Westbound is not a co-owner of "100 Miles."

*The Release and Agreement*

■ Bridgeport acquired a twenty-five percent interest in the musical composition "100 Miles" by way of a Release and Agreement dated December 22, 1998, between Bridgeport, RAM and DNSM (Docket Entry No. 529, Ex. A).[5] Defendant claims that it is a beneficiary of the Release and Agreement as a licensee of the named licensees to the Agreement. The Agreement provides:

1. Bridgeport hereby grants to Licensee, *its licensees and assigns* the irrevocable right to embody the Sample [Get Off] as part of the Composition [100 Miles] and to reproduce, distribute and otherwise exploit the Sample as part of the Composition in all media, including without limitation all record formats, whether now known or hereafter developed, throughout the world in perpetuity.

2. Bridgeport hereby releases and discharges Licensee, its respective representatives, *licensees, successors and assigns* (the "Released Parties") from all actions, controversies, contracts, damages, judgments, claims and demands whatsoever, in law or in equity, which Bridgeport, its assigns and successors may now or hereafter have against the Released Parties with regard to the Composition, excluding only the terms set forth in this agreement.

[Emphasis added.] The defendant claims that this language specifically authorized its use of "100 Miles" as a licensee of DNSM and RAM, Bridgeport's co-owners. Additionally, the defendant claims that the release provision applies to the defendant

and bars this action against it for use of "100 Miles."

Bridgeport's brief does not address whether the defendant is a licensee of RAM and DNSM and therefore entitled to exploit Bridgeport's interest in "100 Miles" pursuant to the terms of the Agreement. Bridgeport instead focuses on the retroactive licenses and arguing that "there is a fact issue as to whether a retroactive license will validate earlier acts of unlicensed infringement" (Docket No. 570 at 8). Bridgeport claims that the release clause in the Agreement does not benefit defendant because: (1) Bridgeport could not have knowingly released its claims against defendant for the use of "100 Miles" in the film *I Got the Hook Up* in December 1998 because fact issues exist as to whether Bridgeport was aware of the use at that time; (2) the defendant was not a licensee of DNSM or RAM in December 1998, when the Agreement was executed, or in 1991, the effective date of the Agreement; (3) "Composition" is defined in the agreement as "all versions of '100 Miles and Runnin" which contain the Sample," and, accordingly to Bridgeport, a "version" of a composition "never refers to a synchronization use in the industry," therefore the Agreement does not apply to defendant's license to use "100 Miles" in a film; and (4) the language of the Agreement reserves to Bridgeport the exclusive right to administer its share of "100 Miles" and RAM and DNSM had no right to license Bridgeport's share (Docket Entry No. 570 at 13–14).

Bridgeport apparently concedes that, *if* defendant is a licensee of RAM and/or DNSM, then it can exploit "100 Miles" in accordance with the terms of the Agree-

---

5. The Release and Agreement is an exhibit to the declaration of Madeleine Smith (filed June 21, 2002; Docket Entry No. 529), which does not lay a proper foundation for the admission of any of the exhibits into evidence. However, since plaintiffs have not objected to admission of the Release and Agreement, any objections are deemed to be waived.

ment. The Court finds that the language of paragraph 1 of the Agreement is clear and unambiguous in granting the Licensees (RAM and DNSM) the right to extend licensing privileges to their licensees and assigns. The Court also rejects the plaintiffs' interpretation regarding the Agreement's applicability to synchronization licenses. Paragraph 1 clearly applies to "all media" with no limitation to sound recordings only. The language of paragraph 1 is unambiguous and therefore there is no need to consider extrinsic evidence as to industry practice.

■ The plaintiffs further claim that because Bridgeport reserved in paragraph 6 the exclusive right to administer and exploit its percentage ownership of the composition, no other co-owner had the right to license Bridgeport's interest in the work. The Court finds that such an interpretation strains the language of the Agreement. If the Court adopted Bridgeport's interpretation, it would vitiate the rights granted by paragraph 1 "to reproduce, distribute and otherwise exploit the Sample as part of the Composition in all media." The better interpretation of paragraph 6 is that Bridgeport sought to affirm that its rights regarding the interest it then was acquiring were in no way impaired. It is conceded by both parties that co-owners have a legal right to grant a license to a work without another co-owner's permission. *See, e.g., Geshwind v. Garrick*, 734 F.Supp. 644, 651 (S.D.N.Y. 1990), *aff'd without op.*, 927 F.2d 594 (2d Cir.), *cert. denied*, 502 U.S. 811, 112 S.Ct.

58, 116 L.Ed.2d 34 (1991); *Nimmer on Copyright* § 6.10 at 6–30. In order for the Court to find a limitation on that right, it must be clear from the language of the Agreement that the parties so intended. No such clear language is presented here.

Therefore, if defendant is found to possess a valid license from RAM and/or DNSM for use of the composition "100 Miles," then the Release and Agreement will operate as an absolute defense to the claim of copyright infringement. Moreover, the release clause, paragraph 2, is equally unambiguous and also operates as a bar provided that defendant had a valid license from either RAM or DNSM.

*The Validity of the Oral Licenses*

■ Defendant claims that it obtained an oral synchronization license for use of "100 Miles" from the original owners in the summer of 1998 (Docket No. 529, ¶ 8). Bridgeport does not dispute that an oral license was granted (Docket No. 578, ¶ 60). Evidence submitted by Bridgeport supports the existence of an oral license (*id.* at Exs. 119 and 181; Docket No. 577, Ex. 7 at 99:7–22). However, Bridgeport claims that at the time of the oral license, defendant was on notice that Bridgeport claimed an interest in "100 Miles" because of its sampling of "Get Off," even if it didn't yet own an interest in the song (Docket No. 578 at ¶ 62). The defendant points out that Bridgeport's proof[6] on this issue does not establish that the defendant had actual or constructive notice of this fact, only that Madeleine Smith of Songwriter Services,

---

6. The Court is compelled to comment on plaintiffs' Statement of Additional Material Facts (Docket No. 578), which is far from "concise," and which contains many assertions that are not facts (see, e.g., ¶¶ 11, 25, 33, 35–37, 40, 64–65), many facts that are immaterial to the issues raised on summary judgment (see, e.g., ¶¶ 20–28), and many facts that are inadequately supported by citations to evidence in the record. The purpose of these

statements is to aid the Court in quickly identifying any issues of material fact that might preclude summary judgment. It does not aid the Court to be forced to re-read every assertion made in a party's brief that has been reformulated into a numbered paragraph. Plaintiffs are admonished to discontinue this practice regarding Local Rule 8(b)(7) statements or risk having such statements stricken from the record.

an entity unrelated to the defendant, was aware of Bridgeport's claims. Richard Joseph, the attorney that handled the film's transactional work on behalf of the defendant, testified that, to his knowledge, Songwriter Services did not notify No Limit of Bridgeport's claim to "100 Miles" (Docket Entry No. 577, Ex. 4 at 108:1–5). Madeleine Smith testified that Songwriter Services was retained by Priority Records, not the defendant, to handle clearance of "100 Miles" for inclusion in the film (*id.*, Ex. 6 at 37:6–38:2 and Ex. 7 at 100:9–12). Bridgeport presents no evidence that contradicts this testimony.

Based on the record, it appears that an oral agreement was obtained from several of the original owners of "100 Miles" to provide a synchronization license to the defendant. Ms. Smith's testimony shows that she approved the synchronization license on behalf of RAM and DNSM in her capacity as publishing administrator for those entities (Docket No. 577, Ex. 7 at 99:7–22) and that she considered the clearance process for the synchronization license to be complete pending issuance of the final license (*id.* at 117:1–118:2, and 127:10–11). Bridgeport produced a letter dated April 3, 1998, from the attorneys for Hancock Music to Songwriter Services outlining the terms for the use of the song in the film (Docket No. 578, Ex. 181). While the letter mentions that Hancock Music controlled twenty-five percent of the song, the letter makes no mention that the authorized use was restricted to Hancock's twenty-five percent interest, only that its approval was subject to Hancock's receipt of its portion of the synchronization fee. It appears from subsequent memoranda from Songwriter Services (Docket No. 578

at 155 and 157) and Ms. Smith's deposition testimony (Docket No. 577, Ex. 7 at 115:10–15) that the terms were modified to increase the synchronization fee to match defendant's usage of an additional twenty seconds of the song, but there is no other evidence that the terms of the final oral license were different than those delineated in the April 3, 1998 letter. It also appears that the terms were finalized prior to Bridgeport obtaining any ownership interest in the song (Docket No. 577, Ex. 7 at 183:20 to 186:23). Therefore, the Court finds that the defendant obtained a valid oral license from at least one of the original owners for use of "100 Miles" prior to Bridgeport obtaining any ownership interest in the song.

After reviewing the entire record, it is clear that the real dispute here lies between Bridgeport and RAM over RAM's failure to properly account to Bridgeport for all income earned by "100 Miles" prior to the execution of the Release and Agreement (see Docket No. 577, Ex. 7 at 116:4–12 [7], 117:1–8, 117:13–118:2, 126:22–127:4, 186:7–20). The terms of the Release and Agreement make clear that Bridgeport's remedy for its failure to receive a portion of the synchronization fee arises from RAM's obligations under the Release and Agreement, not under the copyright laws.

*The Retroactive Synchronization Licenses*

Defendant relies, alternatively, on written licenses issued retroactively by RAM, DNSM and Hancock Music in June of 2002. The plaintiffs argue that these licenses are invalid because they are an attempt to retroactively validate prior acts of infringement. *See Leicester v. Warner*

---

**7.** It is noted that Bridgeport disputes Ms. Smith's testimony that she notified Ms. Peterer of the pending film deal, and that Ms. Peterer has stated in her declaration (filed June 21, 2002; Docket Entry No. 573, ¶ 15) that she discovered the use of "100 Miles" in December 2000. This disputed fact is not material to defendant's summary judgment motion, because the evidence clearly supports the existence of an agreement to provide a synchronization license *prior* to Bridgeport ever obtaining an ownership interest therein.

*Bros.*, 47 U.S.P.Q.2d 1501, 1998 WL 34016724, 1998 U.S. Dist. LEXIS 8366 (C.D.Cal.1998), *aff'd*, 232 F.3d 1212 (2d Cir.2000). In *Leicester*, a real estate developer employed an artist to create sculptural elements for inclusion in the courtyard of a building under construction in Los Angeles. The artist granted the owner the exclusive right to make three-dimensional copies of the work, and a non-exclusive right to make two-dimensional or pictorial copies. The developer allowed a motion picture company to film the sculptural elements as part of a movie. The artist sued the motion picture company, claiming infringement, on the grounds that the developer did not have the right to sub-license his non-exclusive right to make two-dimensional or pictorial copies. During the course of the litigation, the developer was granted a "sub-license" by the building's architect, who the court found to be a co-owner with the artist of some of the elements. The court found that the architect could not grant a sub-license to the developer because a non-exclusive license could not be sub-licensed. *Id.* at *17. The plaintiffs rely on the court's second reason for rejecting the post-litigation license as a defense: that at the time Warner Bros. took the pictures and made pictorial reproductions, it did not have a license to do so, and therefore any infringing activity by Warner Bros. could not be later validated by the grant of a license. *Id.*

Here, the Court has found that the defendant already had a valid, oral license from the same co-owners prior to their issuance of any retroactive license. The written license agreements only serve to memorialize terms already agreed upon

earlier and do not act as a contrivance to avoid copyright infringement liability. *Leicester*, therefore, is clearly distinguishable. *See Great Southern Homes, Inc. v. Johnson & Thompson Realtors*, 797 F.Supp. 609, 612 (M.D.Tenn.1992) (recognizing validity of retroactive license that memorialized grant of oral license).

The plaintiffs also argue that the written licenses do not purport to license the entirety of "100 Miles," only those portions of the song owned by RAM, DNSM and Hancock Music, and therefore the defendant was required to obtain Bridgeport's approval to avoid infringing upon Bridgeport's interest in the song. Each license lists the ownership interest of the licensor as it was on June 26, 1998, prior to the Release and Agreement granting Bridgeport its interest in the song: 36% interest for RAM, 25% interest for Hancock Music, and 14% interest for DNSM.[8]

■ The parties do not dispute that, in general, a co-owner may grant a non-exclusive license for use of a copyright without having to obtain the permission of its co-owners, so long as that co-owner properly accounts to the others for their respective share of the monies received from the license. *See* Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 6.10, at 6–30. The plaintiffs respond that, based on principles of tenancy-in-common, a co-owner may not encumber the whole without permission of its co-owners. However, a non-exclusive license does not "encumber" the copyrighted work—the license in no way interferes with Bridgeport's use and exploitation of its interest in "100 Miles." Bridgeport remains free to copy, distribute and per-

---

**8.** There is no evidence in the record that the fourth original owner of the remaining 25% interest, Stone Agate Music, issued a written license, and scant evidence that Stone Agate agreed to the terms for the oral license.

However, the plaintiffs have not produced any evidence to contradict Ms. Smith's assertion that Stone Agate also granted an oral license in 1998 (Docket Entry No. 529, ¶¶ 7–8).

form the work (to the extent not otherwise contractually restricted by the Release and Agreement), or to issue non-exclusive licenses of its own.

The plaintiffs next argue that the basic rule that co-owners may license the whole work without permission of other co-owners does not insulate the licensee from an infringement claim by another co-owner if the license is issued for use of the licensing co-owner's interest only, and not for the entire work. Even if this may be the case, the Court will not find that a license is intended to apply to less than the whole of a work without a strong showing that this was the intent of the parties, which the plaintiffs have not shown here. The license grants the right to synchronize, perform or record "the music and words of the musical composition set forth below" (Docket Entry No. 529, Exs. B, C and D). The musical composition is described by its title as "100 Miles and Runnin'." There is nothing in the language of the license that limits the licensee's use to only the portion of the song owned by the licensor. The plaintiffs have offered no evidence that even suggests that the licensees intended to license only their portion of the song. Therefore, the plaintiffs' argument must fail.

Lastly, the plaintiffs argue that the Court should take into consideration industry custom and practice in determining whether the license was intended to apply to the work as a whole or only that portion owned by the licensee. The plaintiffs argue that it is the established practice in the film industry for a film maker who wishes to use a song in its film to obtain permission from each of the publishers of the composition, and that such practices are further indicative of the parties' intent here in entering into the licenses. The Court does not find the language of the licenses ambiguous, and therefore there is no need to resort to industry custom and

practice to illuminate the intent of the parties. Moreover, even if the Court concluded that the parties intended to obtain consents from each co-owner, Bridgeport was not a co-owner at the time of the oral license, and the plaintiffs point to no obligation, at law or in contract, that requires the defendant to renegotiate the license with Bridgeport once it obtained an ownership interest.

The Court therefore finds that the defendant is entitled to dismissal of all claims arising from infringement of the musical composition "100 Miles." The Court further finds that the Release and Agreement authorized the use of "Get Off" in the song "100 Miles," therefore the defendant is entitled to dismissal of all claims arising from the infringement of the musical composition "Get Off."

## II.

### REMAINING CLAIM FOR INFRINGEMENT ARISING FROM USE OF "GET OFF" SAMPLE

The only remaining claim is by plaintiff Westbound for the unauthorized use of the sound recording "Get Off" in "100 Miles." The defendant argues that this claim must fail for two reasons: (1) the portion of "Get Off" that was copied was not original and therefore not protected by copyright law; (2) the sample of "Get Off" is legally insubstantial and therefore the sample does not amount to actionable copying under copyright law. For the purposes of this motion, it is assumed that the complained-of sample was digitally copied from the sound recording of "Get Off" since the defendant does not argue otherwise.

*Originality*

■ The defendant argues that the portion of "Get Off" that was sampled is a commonly used collection of notes that, standing alone, is not entitled to copyright

protection. While the plaintiffs are correct that a rebuttable presumption of originality is raised by evidence of copyright registration, this presumption adheres to the work as a whole. *See Murray Hill Publications v. ABC Communications,* 264 F.3d 622, 632 (6th Cir.2001). A defendant may still prove that any element of the work standing alone is not entitled to copyright protection if that element is not original. *See Quinn v. City of Detroit,* 23 F.Supp.2d 741, 746–47 (E.D.Mich.1998) (copyright protection extends only to component parts of work that are original to author). The burden falls on the defendant to show that the infringed work is not original. *See ZZ Top v. Chrysler Corp.,* 54 F.Supp.2d 983, 985 (W.D.Wash.1999).

The portion of the song at issue here is an arpeggiated chord—that is, three notes that, if struck together, comprise a chord but instead are played one at a time in very quick succession—that is repeated several times at the opening of "Get Off." The arpeggiated chord is played on an unaccompanied electric guitar. The rapidity of the notes and the way they are played produce a high-pitched, whirling sound that captures the listener's attention and creates anticipation of what is to follow.

The defendant claims that this chord is a commonly used three-note figure. The plaintiffs claim that the chord is totally unique. The Court believes that the question does not turn on the originality of the chord[9], but in the use of and the aural effect produced by the way the notes in the chord are played, especially here where copying of the sound recording is at issue. *See M.M. Business Forms Corp. v.*

*Uarco, Inc.,* 472 F.2d 1137, 1139 (6th Cir. 1973) ("any 'distinguishable variation' resulting from an author's independent creative endeavor will constitute sufficient originality"); *see also Newton v. Diamond,* 204 F.Supp.2d 1244, 1249–50 (C.D.Cal. 2002) (explaining differences between musical composition and sound recording).

■ After carefully listening to the recording of "Get Off,"[10] the Court finds that a jury could reasonably conclude that the way the arpeggiated chord is used and memorialized in the "Get Off" sound recording is original and creative and therefore entitled to copyright protection. Thus, summary judgment on the basis of lack of originality is not warranted. *Cf. Newton v. Diamond,* 204 F.Supp.2d at 1256 (any originality of sample came from plaintiff's particular performance techniques as captured on sound recording, to which plaintiff did not own copyright).

*De Minimis Use*

■ Next, the defendant argues that the amount of "Get Off" that is sampled is a *de minimis* use as a matter of law and therefore no actionable copying occurred. The defendant argues that the copied chord is neither quantitatively nor qualitatively significant to the plaintiffs' copyright interests in "Get Off" and therefore any copying of the chord is not actionable as a matter of law.

The Sixth Circuit has recognized that the principle of *de minimis non curat lex* ("the law cares not for trifles") can be applied as a defense to copyright infringement if it can be shown that a substantial amount of the copyrighted work was not

---

**9.** The Court must be "mindful of the limited number of notes and chords available to composers." *Gaste v. Kaiserman,* 863 F.2d 1061, 1068 (2d Cir.1988).

**10.** The originality focus must be on the work that is copied, not the infringing work, because there can be no infringement if the portion of the original work that was copied is not entitled to copyright protection. *See Murray Hill Publications,* 264 F.3d at 633.

taken. *Mathews Conveyor Co. v. Palmer–Bee Co.*, 135 F.2d 73, 85 (6th Cir.1943) (affirming dismissal of copyright infringement claims on grounds of *de minimis* use and fair use). The Court's role in making a *de minimis* analysis is a tricky one. It must balance the interests protected by the copyright laws against the stifling effect that overly rigid enforcement of these laws may have on the artistic development of new works. *See Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983) (discussing tension between fostering creativity and assuring author benefits from commercial success of his or her work). This role becomes even more challenging when presented with works from two genres of music with which many jurists (and most likely many jurors of this District) are not familiar, and the paucity of case law on the issue of whether digital sampling amounts to copyright infringement[11]. Further complicating the process is the lack of clear road maps for *de minimis* analyses from the circuit courts or the Supreme Court. Still, the case law does provide loosely-defined standards and quite a bit of legal commentary has been written on digital sampling. The Court must also be mindful not to preempt the jury's role in determining factual issues. *See CyberMedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1077 (N.D.Cal. 1998) ("even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity").

*Legal Standards for De Minimis Analysis*

"Among criteria for ascertaining infringement ... are whether so much has been taken as would sensibly diminish the value of the original; and whether the labors of the party entitled to copyright are substantially to an injurious extent appropriated by another." *Mathews Conveyor*, 135 F.2d at 85. The *de minimis* analysis falls under the rubric of the substantial similarity element necessary to prove a copyright infringement claim. *See Ringgold v. Black Entertainment Television*, 126 F.3d 70, 74 (2d Cir.1997) (*de minimis* applies to copying "at such a trivial extent as to fall below the quantitative threshold of substantial similarity"). The plaintiff must show, in addition to proof of copying, that the copied work and the allegedly infringing work are substantially similar. *Id.* at 74 ("substantial similarity ... is always a required element of actionable copying"); *Mihalek Corp. v. Michigan*, 814 F.2d 290, 296 (6th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 502 (1987). It is the plaintiff's burden to prove substantial similarity. *Mihalek*, 814 F.2d at 294. One of the most common tests for substantial similarity is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Tuff 'N' Rumble*, 42 U.S.P.Q.2d at 1402.

**11.** The Court has found the following cases involving digital music sampling: *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (fair use/parody defense); *Newton v. Diamond*, 204 F.Supp.2d 1244 (C.D.Cal.2002) (no infringement; any original elements copied not contained in musical composition); *Williams v. Broadus*, 60 U.S.P.Q.2d 1051 (S.D.N.Y.2001) (genuine issues of fact existed as to substantial similarity of works); *Tuff 'N' Rumble Management v. Profile Records*, 42 U.S.P.Q.2d 1398 (S.D.N.Y.1997) (summary judgment for defendant where plaintiff did not prove copying or substantial similarity); *Jarvis v. A & M Records*, 827 F.Supp. 282 )(D.N.J.1993) (summary judgment for defendant denied where facts existed as to substantial similarity); *Grand Upright Music Ltd. v. Warner Bros. Records*, 780 F.Supp. 182 (S.D.N.Y.1991) (infringement found without any substantial similarity analysis); and *Fantasy, Inc. v. La Face Records*, 43 U.S.P.Q.2d 1700 (N.D.Cal.1997) (pre–1972 sound recording not protected by Copyright Act).

The *de minimis* analysis is therefore a derivation of substantial similarity, where a defendant argues that the literal copying of a small and insignificant portion of the copyrighted work should be allowed. *Warner Bros.*, 720 F.2d at 242.

Those courts that have addressed a *de minimis* defense in cases of digital sampling have focused on "whether the defendant appropriated, either quantitatively or qualitatively, 'constituent elements of the work that are original'." *Newton v. Diamond*, 204 F.Supp.2d at 1257, quoting *Jarvis v. A & M Records*, 827 F.Supp. at 291. Another court, instead of a quantitative/qualitative *de minimis* analysis, used Professor Nimmer's "fragmented literal similarity" analysis [12] to determine whether substantial similarity existed. *See Williams v. Broadus*, 60 U.S.P.Q.2d at 1054; Nimmer on Copyright § 13.03[A][2] at 13–45 & n. 92.2 ("[t]his aspect of the substantial similarity test may be characterized as an inquiry as to whether the subject usage is substantial or *de minimis*"). Either approach in this case will result in the same outcome. The sample here does not rise to the level of a legally cognizable appropriation.

In "100 Miles," the sample of "Get Off" has been "looped"—that is, the portion of music consisting of the copied chord is repeated several times over. The sample, according to plaintiffs' expert, is comprised of a two-second portion of the chord section that is looped 14–16 times and appears at five separate points in the song [13]; each looped segment is approximately seven to eight seconds long (by the Court's estimation). The total length of all copied segments is therefore at the most 40 seconds. The total running time of "100 Miles" is approximately four and half minutes. The total running time of "Get Off" is approximately two and half minutes. The quantitative use of the plaintiffs' work is a mere fraction of the whole, but constitutes a more significant portion of the work into which it is copied.

As noted above, the quantitative use of the plaintiffs' work is only one factor in either a *de minimis* or substantial similarity analysis. The Court must also evaluate the qualitative use as well. *See Compaq Computer Corp. v. Ergonome Inc.*, 137 F.Supp.2d 768, 779 (S.D.Tex.2001), and cases cited therein. "100 Miles" is a song about four black men on the run from the F.B.I. who appear to be wrongfully pursued for some unmentioned crime. The looped segment evokes the sound of police sirens; it is a background element in the song. Qualitatively, the looped segment bears only passing resemblance to the original chord that was copied. The looped segment has been slowed down to match the tempo of the rest of "100 Miles," which also results in a lowering of the pitch of the notes. Instead of producing a rising sense of anticipation, the effect of the sample is to create tension and apprehension at the sound of pursuing law en-

12. The sample here is an example of fragmented literal similarity because a digital sample is an exact copy, albeit manipulated, of a fragment of the original song. Professor Nimmer proffers the following test:

The question in each case is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work—not whether such material constitutes a substantial portion of defendant's work.[ ] The quantitative relation of the similar material to the total material contained in plaintiff's work is certainly of importance.[ ]

However, even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity.[ ] ... If, however, the similarity is only as to nonessential matters, then a finding of no substantial similarity should result.

Nimmer on Copyright § 13.03[A][2] (footnotes omitted).

13. *See* Expert Report of Randy Kling (filed Jun. 21, 2002; Docket Entry No. 530, Ex. B).

forcement. This effect is amplified by the repeated use of the sample as the rapper describes the men's anger, anxiety and fatalism as the chase continues.

In comparison, "Get Off" is a celebratory song—it is essentially about dancing. The work as a whole is characterized by a strong dance beat and a display of intricate electric guitar playing. The only lyrics are two expletives followed by "Get off your ass and jam" repeated over and over. There are no similarities in mood or tone between the two works. The guitar introduction, where the sampled chord is found, can be compared to the trumpet call at the start of an anthem or march—an attention-grabbing moment meant to create anticipation. It bears no resemblance in tone or purpose to the sound of sirens in "100 Miles." *Cf. Warner Bros.,* 720 F.2d at 231 ("[s]tirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement") (total perception of character from T.V. show not substantially similar to Superman character).

The plaintiffs emphasize the importance of the sampled chord to the overall effect of "Get Off," and the Court does not disagree with that analysis. However, the Court finds that the copied segment is not even recognizable to a lay observer as being appropriated from the plaintiffs' work. The siren sounds in "100 Miles" are in the background, appear at irregular intervals, and their similarity to the guitar introduction to "Get Off" is only apparent if one is made aware of the attribution before hearing the sample. The Court finds that no reasonable jury, even one familiar with the works of George Clinton (the author of "Get Off"), would recognize the source of the sample without having been told of its source. This fact, combined with the minimal quantitative copying and the lack of qualitative similarity

between the works, warrants dismissal of Westbound's claims arising from infringement of its sound recording. *See Wickham v. Knoxville Int'l Energy Exposition,* 739 F.2d 1094 (6th Cir.1984) ("a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity").

The Court recognizes that the fact of blatant copying is not challenged by the defendant for the purposes of this motion, and that the purposes of the copyright laws is to deter wholesale plagiarism of prior works. However, a balance must be struck between protecting an artist's interests, and depriving other artists of the building blocks of future works. Since the advent of Western music, musicians have freely borrowed themes and ideas from other musicians. *See* Sherri Carl Hampel, Note, *Are Samplers Getting a Bum Rap?: Copyright Infringement or Technological Creativity?,* 1992 U. Ill. L.Rev. 559, 583–4 (1992). If even an aficionado of George Clinton's music might not readily ascertain that his music has been borrowed, the purposes of copyright law would not be served by punishing the borrower for his creative use.

Also pending is the plaintiffs' motion for partial summary judgment (filed June 21, 2002; Docket Entry No. 531), which seeks a determination that the plaintiffs own the copyrights to the composition and sound recording of "Get Off." Having dismissed the plaintiffs' copyright infringement claims, the issue of ownership is now irrelevant, and the motion is denied as moot.

## CONCLUSION

For the reasons stated above, the motion by defendant No Limit Films for summary judgment is granted as follows: all claims based on infringement of plaintiff

Bridgeport Music's interest in the musical composition "100 Miles and Runnin"'' are dismissed; all claims based on infringement of plaintiff Bridgeport Music's musical composition "Get Off Your Ass and Jam" are dismissed; all claims based on infringement of plaintiff Westbound Records' sound recording of "Get Off Your Ass and Jam" are dismissed. The plaintiffs' motion for partial summary judgment is denied as moot. There being no further claims against the defendant, and no other remaining defendants, this action is dismissed. An appropriate order will be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the motion of the defendant, No Limit Films, for summary judgment (filed June 21, 2002; Docket Entry No. 525) is granted and the claims of the plaintiffs, Bridgeport Music, Inc. and Westbound Records, Inc., are dismissed with prejudice.

The claims of the plaintiff, Nine Records, Inc., are likewise dismissed with prejudice, the plaintiffs having conceded that Nine Records does not own any interest in the songs at issue.

The motion of plaintiffs, Bridgeport Music, Inc. and Westbound Records, Inc., for partial summary judgment (filed June 21, 2002; Docket Entry No. 531) is denied as moot.

The entry of this order and the orders at Docket Entry Nos. 456, 542 and 564 shall constitute final judgment in this action.

IT IS SO ORDERED.