RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0243a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

No. 02-6521

BRIDGEPORT MUSIC, INC.; WESTBOUND RECORDS, INC.,

*Plaintiffs-Appellants,*

SOUTHFIELD MUSIC, INC.; NINE RECORDS, INC.,

*Plaintiffs,*

*v.*

DIMENSION FILMS; MIRAMAX FILM CORP.,

*Defendants,*

NO LIMIT FILMS LLC,

*Defendant-Appellee.*

No. 03-5738

BRIDGEPORT MUSIC, INC.; SOUTHFIELD MUSIC, INC.; NINE RECORDS, INC.,

*Plaintiffs-Appellants,*

WESTBOUND RECORDS, INC.,

*Plaintiff,*

*v.*

DIMENSION FILMS, et al.,

*Defendants,*

NO LIMIT FILMS LLC,

*Defendant-Appellee.*

Nos. 02-6521; 03-5738

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-00412—Thomas A. Higgins, District Judge.

Argued: March 28, 2005

Decided and Filed: June 3, 2005

Before: GUY and GILMAN, Circuit Judges; BARZILAY, Judge.[*]

_____

[*]The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

1

---

**COUNSEL**

---

**ARGUED:** Richard S. Busch, KING & BALLOW, Nashville, Tennessee, for Appellants. Robert L. Sullivan, LOEB & LOEB, Nashville, Tennessee, for Appellee. **ON BRIEF:** Richard S. Busch, D'Lesli M. Davis, KING & BALLOW, Nashville, Tennessee, for Appellants. Robert L. Sullivan, John C. Beiter, LOEB & LOEB, Nashville, Tennessee, for Appellee. Marjorie Heins, BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW, New York, New York, Paul M. Smith, JENNER & BLOCK, Washington, D.C., Fred von Lohmann, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California, Todd M. Gascon, LAW OFFICE OF TODD GASCON, San Francisco, California, for Amici Curiae.

---

**AMENDED OPINION ON REHEARING**

---

RALPH B. GUY, JR., Circuit Judge.    The court issued an initial opinion in these consolidated cases on September 7, 2004. *Bridgeport Music, Inc. v. Dimension Films*, 383 F.3d 390 (6th Cir. 2004). Through an Order entered December 20, 2004, the full court denied the petition for rehearing en banc filed by No Limit Films and a panel rehearing was granted only with respect to the issues discussed in Section II of the opinion as amended. *Bridegeport Music, Inc. v. Dimension Films*, 401 F.3d 647 (6th Cir. 2004). After additional briefing and argument on rehearing, we adhere to our conclusions and amend the opinion to further clarify our reasoning.

Plaintiffs, Bridgeport Music, Inc., Westbound Records, Inc., Southfield Music, Inc., and Nine Records, Inc., appeal from several of the district court's findings with respect to the copyright infringement claims asserted against No Limit Films.[1] This action arises out of the use of a sample from the composition and sound recording "Get Off Your Ass and Jam" ("Get Off") in the rap song "100 Miles and Runnin'" ("100 Miles"), which was included in the sound track of the movie *I Got the Hook Up* (*Hook Up*). Specifically, Westbound appeals from the district court's decision to grant summary judgment to defendant on the grounds that the alleged infringement was *de minimis* and therefore not actionable. Bridgeport, while not appealing from the summary judgment order, challenges instead the denial of its motion to amend the complaint to assert new claims of infringement based on a different song included in the sound track of *Hook Up*. Finally, Bridgeport, Southfield, and Nine Records appeal from the decision to award attorney fees and costs totaling $41,813.30 to No Limit Films under 17 U.S.C. § 505. For the reasons that follow, we reverse the district court's grant of summary judgment to No Limit on Westbound's claim of infringement of its sound recording copyright, but affirm the decision of the district court as to the award of attorney fees and the denial of Bridgeport's motion to amend.

**I.**

The claims at issue in this appeal were originally asserted in an action filed on May 4, 2001, by the related entities Bridgeport Music, Southfield Music, Westbound Records, and Nine Records, alleging nearly 500 counts against approximately 800 defendants for copyright infringement and various state law claims relating to the use of samples without permission in new rap recordings. In August 2001, the district court severed that original complaint into 476 separate actions, this

---

[1] All of plaintiffs' claims against Miramax Film Corp. and Dimension Films were dismissed with prejudice, pursuant to a settlement, on June 27, 2002.

being one of them, based on the allegedly infringing work and ordered that amended complaints be filed.[2]

The claims in this case were brought by all four plaintiffs: Bridgeport and Southfield, which are in the business of music publishing and exploiting musical composition copyrights, and Westbound Records and Nine Records, which are in the business of recording and distributing sound recordings. It was conceded at the time of summary judgment, however, that neither Southfield Music nor Nine Records had any ownership interest in the copyrights at issue in this case. As a result, the district court ordered that they be jointly and severally liable for 10% of the attorney fees and costs awarded to No Limit Films.

Bridgeport and Westbound claim to own the musical composition and sound recording copyrights in "Get Off Your Ass and Jam" by George Clinton, Jr. and the Funkadelics. We assume, as did the district court, that plaintiffs would be able to establish ownership in the copyrights they claim. There seems to be no dispute either that "Get Off" was digitally sampled or that the recording "100 Miles" was included on the sound track of *I Got the Hook Up*. Defendant No Limit Films, in conjunction with Priority Records, released the movie to theaters on May 27, 1998. The movie was apparently also released on VHS, DVD, and cable television. Fatal to Bridgeport's claims of infringement was the Release and Agreement it entered into with two of the original owners of the composition "100 Miles," Ruthless Attack Muzick (RAM) and Dollarz N Sense Music (DNSM), in December 1998, granting a sample use license to RAM, DNSM, and their licensees. Finding that No Limit Films had previously been granted an oral synchronization license to use the composition "100 Miles" in the sound track of *Hook Up*, the district court concluded Bridgeport's claims against No Limit Films were barred by the unambiguous terms of the Release and Agreement. *Bridgeport Music, Inc. v. Dimension Films LLC*, 230 F. Supp.2d 830, 833-38 (M.D. Tenn. 2002). Although Bridgeport does not appeal from this determination, it is relevant to the district court's later decision to award attorney fees to No Limit Films.

Westbound's claims are for infringement of the sound recording "Get Off."[3] Because defendant does not deny it, we assume that the sound track of *Hook Up* used portions of "100 Miles" that included the allegedly infringing sample from "Get Off." The recording "Get Off" opens with a three-note combination solo guitar "riff" that lasts four seconds. According to one of plaintiffs' experts, Randy Kling, the recording "100 Miles" contains a sample from that guitar solo. Specifically, a two-second sample from the guitar solo was copied, the pitch was lowered, and the copied piece was "looped" and extended to 16 beats. Kling states that this sample appears in the sound recording "100 Miles" in five places; specifically, at 0:49, 1:52, 2:29, 3:20 and 3:46. By the district court's estimation, each looped segment lasted approximately 7 seconds. As for the segment copied from "Get Off," the district court described it as follows:

> The portion of the song at issue here is an arpeggiated chord – that is, three notes that, if struck together, comprise a chord but instead are played one at a time in very quick succession – that is repeated several times at the opening of "Get Off." The arpeggiated chord is played on an unaccompanied electric guitar. The rapidity

---

[2]These are two of eleven appeals arising out of six related lawsuits that have been assigned to this panel for hearing and decision (Nos. 02-6521, 03-5002, 03-5003, 03-5004, 03-5005, 03-5738, 03-5739, 03-5741, 03-5742, 03-5744, 03-5656).

[3]Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights. *See* 17 U.S.C. § 102(a)(2), (7). *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 475 n.3 (6th Cir.), *cert. denied*, 124 S. Ct. 399 (2003) (consolidated appeals from the dismissal of 19 of the 476 actions for lack of personal jurisdiction).

> of the notes and the way they are played produce a high-pitched, whirling sound that captures the listener's attention and creates anticipation of what is to follow.

*Bridgeport*, 230 F. Supp.2d at 839. No Limit Films moved for summary judgment, arguing (1) that the sample was not protected by copyright law because it was not "original"; and (2) that the sample was legally insubstantial and therefore does not amount to actionable copying under copyright law.

Mindful of the limited number of notes and chords available to composers, the district court explained that the question turned not on the originality of the chord but, rather, on "the use of and the aural effect produced by the way the notes and the chord are played, especially here where copying of the sound recording is at issue." *Id.* (citations omitted). The district court found, after carefully listening to the recording of "Get Off," "that a jury could reasonably conclude that the way the arpeggiated chord is used and memorialized in the 'Get Off' sound recording is original and creative and therefore entitled to copyright protection." *Id.* (citing *Newton v. Diamond*, 204 F. Supp.2d 1244, 1249-59 (C.D. Cal. 2002)) (later affirmed on other grounds at 349 F.3d 591 (9th Cir. 2003)). No Limit Films does not appeal from this determination.

Turning then to the question of *de minimis* copying in the context of digital sampling, the district court concluded that, whether the sampling is examined under a qualitative/quantitative *de minimis* analysis or under the so-called "fragmented literal similarity" test, the sampling in this case did not "rise to the level of a legally cognizable appropriation." 230 F. Supp.2d at 841. Westbound argues that the district court erred both in its articulation of the applicable standards and its determination that there was no genuine issue of fact precluding summary judgment on this issue.

On October 11, 2002, the district court granted summary judgment to No Limit Films on the claims of Bridgeport and Westbound; dismissed with prejudice the claims of Southfield and Nine Records; denied as moot the motion of Bridgeport and Westbound for partial summary judgment on the issue of copyright ownership; and entered final judgment accordingly. Bridgeport and Westbound appealed. The facts relevant to the earlier denial of Bridgeport's motion to amend the complaint will be discussed below. No Limit Films filed a post-judgment motion for attorney fees and costs, which the district court granted for the reasons set forth in its memorandum opinion and order of April 24, 2003. Bridgeport, Southfield Music, and Nine Records appealed from that award.

## II.

The district court's decision granting summary judgment is reviewed *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). In deciding a motion for summary judgment, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

In granting summary judgment to defendant, the district court looked to general *de minimis* principles and emphasized the paucity of case law on the issue of whether digital sampling amounts to copyright infringement. Drawing on both the quantitative/qualitative and "fragmented literal similarity" approaches, the district court found the *de minimis* analysis was a derivation of the substantial similarity element when a defendant claims that the literal copying of a small and insignificant portion of the copyrighted work should be allowed. After listening to the copied segment, the sample, and both songs, the district court found that no reasonable juror, even one familiar with the works of George Clinton, would recognize the source of the sample without having been told of its source. This finding, coupled with findings concerning the quantitatively small amount of copying involved and the lack of qualitative similarity between the works, led the district

court to conclude that Westbound could not prevail on its claims for copyright infringement of the sound recording.[4]

Westbound does not challenge the district court's characterization of either the segment copied from "Get Off" or the sample that appears in "100 Miles." Nor does Westbound argue that there is some genuine dispute as to any material fact concerning the nature of the protected material in the two works. The heart of Westbound's arguments is the claim that no substantial similarity or *de minimis* inquiry should be undertaken at all when the defendant has not disputed that it digitally sampled a copyrighted sound recording. We agree and accordingly must reverse the grant of summary judgment.

## A.     Digital Sampling of Copyrighted Sound Recordings

At the outset it is important to make clear the precise nature of our decision. Our conclusions are as follows:

1.  The analysis that is appropriate for determining infringement of a musical composition copyright, is not the analysis that is to be applied to determine infringement of a sound recording. We address this issue only as it pertains to sound recording copyrights.[5]

2.  Since the district court decision essentially tracked the analysis that is made if a musical composition copyright were at issue, we depart from that analysis.[6]

3.  We agree with the district court's analysis on the question of originality. On remand, we assume that Westbound will be able to establish it has a copyright in the sound recording and that a digital sample from the copyrighted sound recording was used in this case.

4.  This case involves "digital sampling" which is a term of art well understood by the parties to this litigation and the music industry in general. Accordingly, we adopt the definition commonly accepted within the industry.

5.  Because of the court's limited technological knowledge in this specialized field, our opinion is limited to an instance of digital sampling of a sound recording protected by a valid copyright. If by analogy it is possible to extend our analysis to other forms of sampling, we leave it to others to do so.

---

[4]Were we to follow the analysis used by the district judge, we would agree with the result he reached.

[5]Defendants initially claimed that this argument was made for the first time on appeal. Since a panel rehearing was granted, defendants have had a full opportunity to brief and argue these issues.

[6]"In most copyright actions, the issue is whether the infringing work is substantially similar to the original work. . . . The scope of inquiry is much narrower when the work in question is a sound recording. The only issue is whether the actual sound recording has been used without authorization. Substantial similarity is not an issue . . . ." Bradley C. Rosen, Esq., 22 CAUSES OF ACTION § 12 (2d ed. 2003).

6. Advances in technology[7] coupled with the advent of the popularity of hip hop or rap music have made instances of digital sampling extremely common and have spawned a plethora of copyright disputes and litigation.

7. The music industry, as well as the courts, are best served if something approximating a bright-line test can be established. Not necessarily a "one size fits all" test, but one that, at least, adds clarity to what constitutes actionable infringement with regard to the digital sampling of copyrighted sound recordings.

## B.     Analysis

We do not set forth the arguments made by Westbound since our analysis differs somewhat from that offered by the plaintiff. Our analysis begins and largely ends with the applicable statute. Section 114(a) of Title 17 of the United States Code provides:

> The exclusive rights of the owner of copyright in a sound recording are limited to the rights specified by clauses (1), (2), (3) and (6) of section 106, and do not include any right of performance under section 106(4).

Section 106 provides:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1)   to reproduce the copyrighted work in copies or phonorecords;
>
> (2)  to prepare derivative works based upon the copyrighted work;
>
> (3)  to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4)   in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works to perform the copyrighted work publicly;
>
> (5)   in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

---

[7] "E.g., Terry Fryer, Sampling Jargon Illustrated, KEYBOARD, June 1988, at 66-73. First, the cost barrier to enter into the audio production arena is low due to the influx of affordable digital recording equipment. The combination of a microphone, digital audio equipment, consumer audio equipment and an album or compact disc collection are the only tools needed to produce commercial rap music. Second, utilizing samples as the musical element of the song enables the producer to create commercial rap music without any original musical accompaniment prior to recording the vocals. Third, using music samples saves a considerable amount of time when compared to the traditional recording methods because another artist already recorded the underlying music. . . ." Stephen R. Wilson, *Music Sampling Lawsuits: Does Looping Music Samples Defeat the De Minimis Defense?*, 1 Journal of High Technology Law (JHTL) 179 n.9 (2002) (citations omitted).

(6)   in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

Section 114(b) states:

(b)  The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106 is limited to the right to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording.  The exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality.  The exclusive rights of the owner of copyright in a sound recording under clauses (1) and (2) of section 106 do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.  The exclusive rights of the owner of copyright in a sound recording under clauses (1), (2), and (3) of section 106 do not apply to sound recordings included in educational television and radio programs (as defined in section 397 of title 47) distributed or transmitted by or through public broadcasting entities (as defined by section 118(g)): *Provided*, That copies or phonorecords of said programs are not commercially distributed by or through public broadcasting entities to the general public.

Before discussing what we believe to be the import of the above quoted provisions of the statute, a little history is necessary.  The copyright laws attempt to strike a balance between protecting original works and stifling further creativity.  The provisions, for example, for compulsory licensing make it possible for "creators" to enjoy the fruits of their creations, but not to fence them off from the world at large. 17 U.S.C. § 115.  Although musical compositions have always enjoyed copyright protection, it was not until 1971 that sound recordings were subject to a separate copyright. If one were to analogize to a book, it is not the book, *i.e.*, the paper and binding, that is copyrightable, but its contents.  There are probably any number of reasons why the decision was made by Congress to treat a sound recording differently from a book even though both are the medium in which an original work is fixed rather than the creation itself.  None the least of them certainly were advances in technology which made the "pirating" of sound recordings an easy task. The balance that was struck was to give sound recording copyright holders the exclusive right "to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording." 17 U.S.C. § 114(b).  This means that the world at large is free to imitate or simulate the creative work fixed in the recording so long as an actual copy of the sound recording itself is not made.[8]  That leads us directly to the issue in this case. If you cannot pirate the whole sound recording, can you "lift" or "sample" something less than the whole.  Our answer to that question is in the negative.[9]

Section 114(b) provides that "[t]he exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in

---

[8]Needless to say, in the case of a recording of a musical composition the imitator would have to clear with the holder of the composition copyright.

[9]A question arises as to whether the copying of a single note would be actionable.  Since that is not the fact situation in this case, we need not provide a definitive answer. We note, however, that under the Copyright Act, the sound recording must "result from the fixation of a series of musical, spoken, or other sounds . . . ."  17 U.S.C. § 101 (definition of "sound recording").

sequence or quality." Further, the rights of sound recording copyright holders under clauses (1) and (2) of section 106 "do not extend to the making or duplication of another sound recording that consists *entirely* of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording." 17 U.S.C. § 114(b) (emphasis added). The significance of this provision is amplified by the fact that the Copyright Act of 1976 added the word "entirely" to this language. *Compare* Sound Recording Act of 1971, Pub. L. 92-140, 85 Stat. 391 (Oct. 15, 1971) (adding subsection (f) to former 17 U.S.C. § 1) ("does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds"). In other words, a sound recording owner has the exclusive right to "sample" his own recording. We find much to recommend this interpretation.[10]

To begin with, there is ease of enforcement. Get a license or do not sample. We do not see this as stifling creativity in any significant way. It must be remembered that if an artist wants to incorporate a "riff" from another work in his or her recording, he is free to duplicate the sound of that "riff" in the studio. Second, the market will control the license price and keep it within bounds.[11] The sound recording copyright holder cannot exact a license fee greater than what it would cost the person seeking the license to just duplicate the sample in the course of making the new recording. Third, sampling is never accidental. It is not like the case of a composer who has a melody in his head, perhaps not even realizing that the reason he hears this melody is that it is the work of another which he had heard before. When you sample a sound recording you know you are taking another's work product.[12]

This analysis admittedly raises the question of why one should, without infringing, be able to take three notes from a musical composition, for example, but not three notes by way of sampling from a sound recording. Why is there no *de minimis* taking or why should substantial similarity not enter the equation.[13] Our first answer to this question is what we have earlier indicated. We think this result is dictated by the applicable statute. Second, even when a small part of a sound recording

---

[10]"[B] by clarifying the rights of a sound recording copyright owner in regard to derivative works, Section 114(b) makes it clear that the digital sampling of a copyrighted sound recording must typically be licensed to avoid an infringement. . . . The import of this language is that it does not matter how much a digital sampler alters the actual sounds or whether the ordinary lay observer can or cannot recognize the song or the artist's performance of it. Since the exclusive right encompasses rearranging, remixing, or otherwise altering the actual sounds, the statute by its own terms precludes the use of a substantial similarity test." Susan J. Latham, *Newton v. Diamond: Measuring the Legitimacy of Unauthorized Compositional Sampling–A Clue Illuminated and Obscured*, 26 Hastings Comm. & Ent. L.J. 119, 125 (2003) (footnotes omitted).

[11]"Samplers should apply for the appropriate licenses, respect the rights of copyright holders, and be respected in turn as equal creators, Responsibility for obtaining clearance should fall to either the artist, the label, or both. Samplers realize that in the litigious environment of the United States, there is nothing to be gained and much money potentially to be lost by being a renegade. Surely some obscure materials will be sampled and overlooked, but the process should proceed devoid of recrimination and with the opportunity for money to be made by both the sampler and those whom he samples." David Sanjek, *"Don't Have to DJ No More": Sampling and the "Autonomous" Creator*, 10 Cardozo Arts & Ent. L.J. 607, 621 (1992).

[12]The opinion in *Grand Upright Music Ltd. v. Warner Bros. Records, Inc.*, 780 F. Supp. 182 (S.D.N.Y. 1991), one of the first cases to deal with digital sampling, begins with the phrase, "'Thou shalt not steal.'" *Id.* at 183 (quoting *Exodus* 20:15).

[13]"Thus, it seems like the only way to infringe on a sound recording is to re-record sounds from the original work, which is exactly the nature of digital sound sampling. Then the only issue becomes whether the defendant re-recorded sound from the original. This suggests that the substantial similarity test is inapplicable to sound recordings." Jeffrey R. Houle, *Digital Audio Sampling, Copyright Law and the American Music Industry: Piracy or Just a Bad "RAP"?*, 37 Loy. L. Rev. 879, 896 (1992).

is sampled, the part taken is something of value.[14] No further proof of that is necessary than the fact that the producer of the record or the artist on the record intentionally sampled because it would (1) save costs, or (2) add something to the new recording, or (3) both. For the sound recording copyright holder, it is not the "song" but the sounds that are fixed in the medium of his choice. When those sounds are sampled they are taken directly from that fixed medium. It is a physical taking rather than an intellectual one.

This case also illustrates the kind of mental, musicological, and technological gymnastics that would have to be employed if one were to adopt a *de minimis* or substantial similarity analysis. The district judge did an excellent job of navigating these troubled waters, but not without dint of great effort. When one considers that he has hundreds of other cases all involving different samples from different songs, the value of a principled bright-line rule becomes apparent. We would want to emphasize, however, that considerations of judicial economy are not what drives this opinion. If any consideration of economy is involved it is that of the music industry. As this case and other companion cases make clear, it would appear to be cheaper to license than to litigate.[15]

Since our holding arguably sets forth a new rule, several other observations are in order. First, although there were no existing sound recording judicial precedents to follow,[16] we did not

---

[14] "(A)ll samples from a record appropriate the work of the musicians who performed on that record. This enables the sampler to use a musical performance without hiring either the musician who originally played it or a different musician to play the music again. Thus sampling of records . . . allows a producer of music to save money (by not hiring a musician) without sacrificing the sound and phrasing of a live musician in the song. This practice poses the greatest danger to the musical profession because the musician is being replaced with himself." Christopher D. Abramson, *Digital Sampling and the Recording Musician: A Proposal for Legislative Protection*, 74 N.Y.U. L. REV. 1660, 1668 (1999) (footnote omitted).

[15] "The current lack of bright-line rules leads to unpredictability, which may be one reason that so few sampling cases are brought to trial . . . . A cost-benefit analysis generally indicates that is is less expensive for a sampler to purchase a license before sampling (or settle a post-sampling lawsuit) rather than take his chances in an expensive trial, the outcome of which . . . is nearly impossible to predict with any degree of certainty." Stephen R. Wilson, *Music Sampling Lawsuits: Does Looping Music Samples Defeat the De Minimis Defense*, 1 Journal of High Technology Law (JHTL) 179, 187 n.97 (2002).

[16] Two prior cases are worthy of mention, however, as they are often cited in discussions of digital sampling. These cases are *Grand Upright Music Ltd. v. Warner Bros. Records, Inc.*, 780 F. Supp. 182 (S.D.N.Y. 1991), and *United States v. Taxe*, 540 F.2d 961 (9th Cir. 1976).

Although *Grand Upright* applied a bright-line test in a sampling case, we have not cited it as precedent for several reasons. First, it is a district court opinion and as such has no binding precedential value. Second, although it appears to have involved claims for both sound recording and musical composition copyright infringement, the trial judge does not distinguish which he is talking about in his ruling, and appears to be addressing primarily the musical composition copyright. Third, and perhaps most important, there is no analysis set forth to indicate how the judge arrived at his ruling, which has resulted in the case being criticized by commentators. Although often cited in later cases, there appears to be no case involving only the digital sampling of sound recordings that has relied on that decision. Nonetheless, it did precipitate a significant increase in licensing requests and changes in the way some artists and recording companies approached the issue of digital sampling.

*Taxe* involved a criminal prosecution of sound recording "pirates." The defendants were convicted in the district court and on appeal the court held that a jury instruction that characterized "any and all re-recordings as infringements" went too far, but nonetheless found the instructions as a whole to be free of any error requiring reversal. Like *Grand Upright*, there was no analysis to support this conclusion. This is understandable because the court was upholding the instructions given and had no need to dwell on that portion of the instruction the court "believed" "went beyond the law." *Taxe*, 540 F.2d at 965. Although *Taxe* has been cited frequently, it has not been cited for the pronouncement relative to the nature of the copyright protection afforded to sound recordings. It has been cited, however, for the proposition that infringement occurs even though the unauthorized recording makes changes in the sounds duplicated. *Id*. at n.2.

pull this interpretation out of thin air.[17]  Several law review and text writers, some of whom have been referenced in this opinion, have suggested that this is the proper interpretation of the copyright statute as it pertains to sound recordings.[18]  Since digital sampling has become so commonplace and rap music has become such a significant part of the record industry, it is not surprising that there are probably a hundred articles dealing with sampling and its ramifications.  It is also not surprising that the viewpoint expressed in a number of these articles appears driven by whose ox is being gored.  As is so often the case, where one stands depends on where one sits.  For example, the sound recording copyright holders favor this interpretation as do the studio musicians and their labor organization.  On the other hand, many of the hip hop artists may view this rule as stifling creativity.  The record companies and performing artists are not all of one mind, however, since in many instances, today's sampler is tomorrow's samplee.  The incidence of "live and let live" has been relatively high, which explains why so many instances of sampling go unprotested and why so many sampling controversies have been settled.

---

[17]We have not addressed several of the cases frequently cited in music copyright cases because in the main they involve infringement of the composition copyright and not the sound recording copyright or were decided on other grounds.  *Baxter v. MCA, Inc.*, 812 F.2d 421 (9th Cir. 1987); *Jarvis v. A&M Records*, 827 F. Supp. 282 (D.N.J. 1993); *Tuff 'N' Rumble Mgmt., Inc. v. Profile Records,* Inc., 42 U.S.P.Q.2d 1398 (S.D.N.Y. 1987) (plaintiff did not prove ownership of valid copyright or actual copying); *Williams v. Broadus*, 60 U.S.P.Q.2d 1051 (S.D.N.Y. 2001); *Newton v. Diamond*, 349 F.3d 591 (9th Cir. 2003), *amended* 388 F.3d 1189 (9th Cir. 2004), *petition for cert. filed*, 73 U.S.L.W. 3557 (U.S. Mar. 10, 2005) (No. 04-1219).  We note that in *Newton*, the matter at issue was infringement of the composition copyright.  The alleged infringer had secured a license for use of the sound recording.

[18]"Certain provisions of the copyright law, however, do suggest that broader protection against unauthorized sampling may be available for owners of sound recordings than for the owners of musical compositions that may be embodied in those sound recordings.

For example, the copyright act states that, 'The exclusive rights of the owner of copyright in a sound recording . . . do not extend to the making or duplication of another sound recording that consists *entirely* of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording' [17 U.S.C. § 114(b)] (emphasis added).  By using the words '*entirely* of an independent fixation' in referring to sound recordings which may imitate or simulate the sounds of another, Congress may have intended that a recording containing *any* sounds of another recording would constitute infringement.  Thus, it would appear that any unauthorized use of a digital sample taken from another's copyrighted recording would be an infringement of the copyrighted recording.

In fact, the copyright law specifically provides that the owner of copyright in a sound recording has the exclusive right to prepare a derivative work 'in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality.'  A recording that embodies samples taken from the sound recording of another is by definition a 'rearranged, remixed, or otherwise altered in sequence or quality.'

It has been suggested that the strong protection implied by the foregoing provisions could be mitigated by a judicially applied standard which permits some degree of *de minimis* copying or copying where the sampled portion of the resulting work is not substantially similar to the copied work.  For example, a court could determine that the taking of a millisecond of sound from another's copyrighted recording, or the taking of a more extensive portion that has been modified to the point of being completely unrecognizable or impossible to associate with the copied recording, does not constitute infringement.  It is believed, however, that the courts should take what appears to be a rare opportunity to follow a 'bright line' rule specifically mandated by Congress.  This would result in a substantial reduction of litigation costs and uncertainty attending disputes over sampling infringement of sound recordings and would promote a faster resolution of these disputes.

While the question whether an unauthorized use of a digital sample infringes a musical composition may require a full substantial similarity analysis, the question whether the use of a sample constitutes infringement of a sound recording could end upon a determination that the sampler physically copied the copyrighted sound recording of another.  If the sampler physically copied any portion of another's copyrighted sound recording, then infringement should be found.  If the sampler did not physically copy, then there could be no infringement (even if the resulting recording substantially simulates or imitates the original recording)."  AL KOHN & BOB KOHN, KOHN ON MUSIC LICENSING 1486-87 (Aspen Law & Business  3d ed. 2002) (footnotes omitted).

Second, to pursue further the subject of stifling creativity, many artists and record companies have sought licenses as a matter of course.[19] Since there is no record of those instances of sampling that either go unnoticed or are ignored, one cannot come up with precise figures, but it is clear that a significant number of persons and companies have elected to go the licensing route. Also there is a large body of pre-1972 sound recordings that is not subject to federal copyright protection.[20] Additionally, just as many artists and companies choose to sample and take their chances, it is likely that will continue to be the case.

Third, the record industry, including the recording artists, has the ability and know-how to work out guidelines, including a fixed schedule of license fees, if they so choose.

Fourth, we realize we are announcing a new rule and because it is new, it should not play any role in the assessment of concepts such as "willful" or "intentional" in cases that are currently before the courts or had their genesis before this decision was announced.

Finally, and unfortunately, there is no Rosetta stone for the interpretation of the copyright statute. We have taken a "literal reading" approach. The legislative history is of little help because digital sampling wasn't being done in 1971. If this is not what Congress intended or is not what they would intend now, it is easy enough for the record industry, as they have done in the past, to go back to Congress for a clarification or change in the law. This is the best place for the change to be made, rather than in the courts, because as this case demonstrates, the court is never aware of much more than the tip of the iceberg. To properly sort out this type of problem with its complex technical and business overtones, one needs the type of investigative resources as well as the ability to hold hearings that is possessed by Congress.

These conclusions require us to reverse the entry of summary judgment entered in favor of No Limit Films on Westbound's claims of copyright infringement. Since the district judge found no infringement, there was no necessity to consider the affirmative defense of "fair use." On remand, the trial judge is free to consider this defense and we express no opinion on its applicability to these facts.

### III.

Bridgeport's substantive appeal is from the denial of leave to file a second amended complaint that would have asserted new claims of infringement based on the inclusion of a different

---

[19]"As a result of actual, as well as threatened, litigation in the area of digital sampling infringement, several developments have occurred. Sampling clearinghouses serve as one recent outgrowth. These companies are similar to publisher clearinghouses in that they are authorized by member copyright owners to clear samples for use on albums according to an agreed upon fee structure. In addition, record companies and most music publishers have instituted certain licensing policies as more and more artists routinely seek clearance for their samples with the hope of avoiding litigation." A. Dean Johnson, *Music Copyrights: The Need for an Appropriate Fair Use Analysis in Digital Sampling Infringement Suits*, 21 FLA. ST. U. L. REV. 135, 163 (1993) (footnote omitted).

[20]We speak as to federal copyright protection only, and recognize that the Copyright Act provides that: "With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2067. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067." 17 U.S.C. § 301(c) (1998).

song, called "How Ya Do Dat," in the sound track of *Hook Up.*[21] We review the denial of a motion to amend for abuse of discretion, except to the extent that it is based on a legal determination that the amendment would not withstand a motion to dismiss. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001). Leave to amend a pleading shall be freely given "when justice so requires." FED. R. CIV. P. 15(a).

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989) (quoting *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)). "When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade*, 259 F.3d at 459 (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).

## A.    Facts

Plaintiffs commenced this action in May 2001, and filed an amended complaint in September 2001. In November 2001, the district court entered a scheduling order which required that any motion to amend pleadings be filed far enough in advance of April 1, 2002, to allow briefing to be completed by that date. Discovery was to be completed by May 21, 2002. On March 18, 2002, the district court extended the time for amending pleadings with the proviso that it would have to be done in time to avoid extending discovery beyond May 21, 2002.

On April 15, 2002, plaintiffs' counsel received a "cue sheet" for *Hook Up* that apparently alerted Bridgeport to the presence of another song in which it held a copyright interest. Specifically, Bridgeport claims 37% interest in the composition "How Ya Do Dat" ("How Ya") under a Release and Agreement dated October 21, 1998, that granted permission to use a sample from the composition "One of Those Funky Things" in "How Ya." While there was disagreement about whether discovery made available as early as October 2001 should have alerted Bridgeport of this claim, there is no dispute that the presence of "How Ya" was readily observable from watching the movie. In fact, the magistrate judge noted that the "cue sheet" appears to be a list of credits from the end of the film.

Plaintiffs moved to amend on April 19, 2002, and No Limit Films opposed the motion in a response filed on April 26, 2002. On May 6, 2002, the magistrate judge recommended that the motion be denied. Plaintiffs filed objections on May 16, 2002, and defendant responded on May 30, 2002. The discovery cutoff date, May 21, had passed, but the deadline for completing depositions had been extended to June 14, 2002. But, the deadline for filing dispositive motions continued to be June 21, 2002. No Limit Films filed its motion for summary judgment on that date. On August 14, 2002, the district court entered its order overruling plaintiffs' objections, denying plaintiffs' motion to amend, and denying plaintiffs' further motion to certify the issue for appeal.

---

[21]The district court also denied plaintiffs leave to amend to add claims against new parties arising from the inclusion of "100 Miles" in *I Got the Hook Up*. Plaintiffs have abandoned any appeal with respect to the denial of that request.

**B.     Analysis**

Bridgeport maintains the district court abused its discretion by denying leave to amend on the grounds of unjustified delay and in the absence of a finding of prejudice to the defendant. It is true that, ordinarily, delay alone will not justify the denial of leave to amend the complaint. *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). Delay, however, will become "undue" at some point, "placing an unwarranted burden on the court," or "'prejudicial,' placing an unfair burden on the opposing party." *Morse*, 290 F.3d at 800 (citing *Adams v. Gould Inc.*, 739 F.2d 858, 863 (3d Cir. 1984)).

Had the district court made an explicit finding of prejudice, very little would need to be said in affirming the denial of leave in this case. The district court's order, although brief, touched on undue delay and prejudice, explaining:

> The plaintiffs object to the Magistrate Judge's conclusion that plaintiffs had not offered a sufficient reason for failing to amend their complaint to add claims and parties by the deadline set by the Court. Plaintiffs argue that this deadline was modified by subsequent order, and that the Magistrate Judge erred under Sixth Circuit law by not allowing the amendments in the interests of justice. The defendants respond that [the] Magistrate Judge correctly concluded that, under the circumstances of this case, amendment on the eve of the close of discovery would be prejudicial to defendants and unduly delay trial.
>
> After careful consideration of the entire record, the Court adopts and approves the Magistrate Judge's Report and Recommendation. The plaintiffs' objections are overruled. The interest of justice in this case requires that plaintiffs show good cause why the Court should allow amendment of their complaint to add a claim and parties after the Court's deadline for such amendments, which the plaintiffs have failed to do.

To the extent that this brief discussion leaves doubt that a finding of prejudice was made, we may sustain a denial of leave to amend on grounds that are apparent from the record. *Morse*, 290 F.3d at 801.

Defendant clearly argued that it would be unfairly prejudiced if required to respond to a distinct new claim of infringement with only a few weeks of discovery remaining. Plaintiffs focus on the magistrate judge's mistaken reliance on the April 1 deadline for seeking leave to amend. Nonetheless, as defendant argues, plaintiffs' motion was not timely because the district court required that any amendments be sought in sufficient time that discovery could be completed before May 21. Also, the record reflects that although there were extensions of discovery beyond that date, extensions were only granted to allow the completion of certain depositions and did not affect the deadline for filing dispositive motions. We find no abuse of discretion in the district court's denial of leave to raise new claims based on a different song, by a different artist, in the movie.

**IV.**

Bridgeport, Southfield Music, and Nine Records appeal from the decision to award $41,813.30 in attorney fees and costs to No Limit Films as a prevailing party under 17 U.S.C. § 505. Apportioning the award between these plaintiffs, the district court ordered that Southfield and Nine Records be held liable, jointly and severally, for 10% of the total. The district court also found that no award was warranted against Westbound Records because its claims were objectively reasonable and based on a developing area of copyright law. As a result, the amount of fees reasonably incurred in defense of this action were reduced by 50%. Plaintiffs do not challenge the calculation of the fees or the inclusion of any particular item.

A court may, in its discretion, award costs, including reasonable attorney fees, to the prevailing party in a civil suit under the Copyright Act. 17 U.S.C. § 505.[22] Our review is for abuse of discretion. *Coles v. Wonder*, 283 F.3d 798, 804 (6th Cir. 2002) (affirming award to prevailing defendant); *Murray Hill Publ'ns, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 639 (6th Cir. 2001) (reversing award to prevailing defendant). A district court abuses its discretion when it relies on clearly erroneous factual findings, improperly applies the law, or uses an erroneous legal standard. *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).

The discretion to award attorney fees under § 505 is to be exercised in an evenhanded manner with respect to prevailing plaintiffs and prevailing defendants, and in a manner consistent with the primary purposes of the Copyright Act. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). "'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" *Id.* at 534 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983)).[23] Several nonexclusive factors may be considered as long as they are "faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." *Id.* at 534 n.19. Those nonexclusive factors include: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)).

Southfield and Nine Records, neither of which had an interest in "Get Off" or "100 Miles," argue that defendant did not truly prevail against them because they were "inadvertently" left in the amended complaint and they did not oppose dismissal in this case. They did not voluntarily dismiss their claims, however, as it was only in response to defendant's dispositive motions that they acquiesced in dismissal. Moreover, the inclusion of Southfield and Nine Records in the amended complaint in this case was less "inadvertent" than a reflection of the plaintiffs' failure to discriminate between defendants and claims. No Limit Films is a prevailing defendant as judgment was entered in its favor on all claims.[24]

Concluding that Bridgeport's claim was objectively unreasonable, the district court indicated that the factor weighed heavily in favor of awarding fees. The district court, relying on its decision granting summary judgment to defendant, specifically found Bridgeport's claims were objectively unreasonable because Bridgeport had no ownership interest in "100 Miles" when the oral synchronization license was granted and offered no evidence to undermine the existence of a valid license. Bridgeport argues that its claim, although unsuccessful, was not objectively unreasonable because it was not aware No Limit would claim it had an oral license that preceded the Release and

---

[22]Section 505 provides that: "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."

[23]Those considerations include: the primary objective of the Copyright Act to "encourage the production of original literary, artistic, and musical expression for the good of the public"; the fact that defendants as well as plaintiffs may hold copyrights and run the "gamut" from large corporations to "starving artists"; the need to encourage "defendants who seek to advance a variety of meritorious copyright defenses . . . to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement"; and the fact that "a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright." *Id.* at 524 and 527.

[24]Plaintiffs argue that Southfield had a significant interest in "How Ya Do Dat" and joined Bridgeport in seeking leave to file the second amended complaint to assert infringement claims. That assertion does not affect the prevailing party status of defendant or undermine the finding that the claims which were asserted were objectively unreasonable.

Agreement. As defendant responds, nothing in this record suggests Bridgeport would not have sued No Limit Films if it had been aware of the oral license.

This brings us to what the district court called the deciding factor – the manner in which the plaintiffs litigated this action. This consideration, plaintiffs maintain, represents nothing more than an attempt to punish Bridgeport and deter the plaintiffs from pursuing reasonable, nonfrivolous claims in other cases under threat of an award of attorney fees. The district court reasoned as follows:

> The initial complaint in this action is so voluminous that, with exhibits, it is almost 1,000 pages long and takes days to read in its entirety. It is replete with diatribes against the music industry, but lacks concrete facts directed at specific defendants. Almost all of the 800 or so defendants in the initial complaint (representing what appeared to be almost the entirety of entities involved in making urban music) were lumped together in broad categories and descriptions of activities. The individual counts described the infringing conduct of the defendants by references to these broad generalizations, without any specific information as to what any individual defendant did to violate the Copyright Act.

> From that inauspicious beginning, this action proceeded in a like manner, with heavy emphasis on discovery disputes and motion practice and little attention paid to narrowing the issues and refining the claims. The plaintiffs repeatedly taxed the patience of the Court, from narrowing the margins on their memoranda to circumvent page limits, to filing voluminous pleadings that were long on argument but short on concrete facts or applicable legal authority. The plaintiffs took every opportunity to inundate the Court with paperwork, yet many of these motions were hastily prepared and often lacked sufficient legal or factual support. Most notably, the plaintiffs filed a motion for summary judgment on ownership yet failed to submit certified copies of the registration certificates for the copyrights they claimed to own. When this oversight was pointed out by the Magistrate Judge as being fatal to their summary judgment motion, the plaintiffs, instead of providing the documentation (which could be easily obtained from the U.S. Copyright Office), expended enormous effort in subsequent motion papers trying to convince the Court that the certified copies were unnecessary [until ordered to produce them].

> The plaintiffs' tactics have contributed to the multiplication of fees by all parties, including the defendant here. This, combined with the determination that Bridgeport's claim was objectively unreasonable, merits an award for fees and costs against Bridgeport.

To award fees simply because of the length of and lack of specificity in the original complaint or because of the number of claims brought by the plaintiffs would strike us as punitive and inconsistent with the purposes of the Copyright Act. *See Murray Hill*, 264 F.3d at 639-40 (reversing award of attorney fees, despite district court's criticism of the "voluminous burden" the case imposed, noting only that the law was unsettled and the plaintiff presented one or more colorable claims). The district court's criticisms go beyond just that, however, and are tied to conduct that complicated rather than streamlined the issues and contributed to the multiplication of fees for the defendant.

While the district court did not articulate this consideration in terms of the *Fogerty* factors, and was not required to since they are nonexclusive, we see it as related to the recognized factor of deterrence and compensation. The unique posture of this case as one of hundreds brought in the same manner and asserting parallel claims, makes deterrence a particularly relevant and appropriate

consideration. It is not the deterrence of objectively reasonable good faith claims, but the interest in motivating plaintiffs to sort through the objectively unreasonable ones and prosecute this at best cumbersome litigation in a way that discriminates between parties and claims.

Plaintiffs charge that the defendant was equally responsible for multiplying fees, particularly by failing to designate a representative for deposition who had knowledge of the facts concerning the use of "Get Off" in *Hook Up*. While there is some suggestion that defendant contributed to increased discovery costs because multiple depositions were required, our review is deferential and the record does not demonstrate clear error in the district court's assessment of plaintiffs' litigation conduct. Ultimately, we cannot say the district court abused its discretion in this case, particularly given the 50% reduction in attorney fees to account for Westbound's claims. Nor should Southfield and Nine Records be relieved of the nominal award of fees in this case, as defendant was required to investigate whether they had any claim and affirmatively move for dismissal of their claims before it was conceded that they had no interest in the copyrighted works.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.